IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRET GOLDEN MACARTHUR,<br><br>Plaintiff,<br><br>vs.<br><br>KENNON TUBBS ET AL.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:15-CV-117 DB<br><br>District Judge Dee Benson |

Plaintiff, Bret Golden MacArthur, began this lawsuit as a *pro se* prisoner proceeding *in forma pauperis*. (ECF No. 4.) In his verified amended civil-rights complaint, 42 U.S.C.S. § 1983 (2020), he requests declaratory and injunctive relief, and compensatory and punitive damages. (ECF No. 28, at 16, 18, 26-27.)

## I. BACKGROUND

Plaintiff names, in individual and official capacities, the following defendants: Angerhofer (contract attorney); Bonkosky (emergency medical technician (EMT))[1]; Casper (grievance coordinator); Clark (physician assistant (PA)); DeMill (lieutenant); Douglas (registered nurse); Drake (sergeant); Freestone (contract attorney); Green (lieutenant); Gurney (sergeant); Hughes (captain); Laursen (sergeant); Merrill (PA); Roberts (medical doctor (MD)); Tubbs (MD); Wendler (EMT). (*Id.* at 4-8.)

---

[1] In his amended complaint, Plaintiff refers to Bonkosky as "Defendant John Doe I." (ECF No. 28, at 10.) The Court has been able to discern from medical records that Defendant John Doe I is Bonkosky.

He asserts the following claims under the Federal Constitution: (a) cruel and unusual punishment as to medical treatment, (*id*. at 8); and (b) retaliation, (*id*. at 19).

On May 29, 2018, the Court screened the amended complaint, (ECF No. 28), and dismissed Defendants Casper and Roberts, based on failure to state a claim upon which relief may be granted. (ECF No. 26.)

On March 6, 2019, Defendant Angerhofer and Freestone's motion to dismiss was granted. (ECF No. 48.)

On March 18, 2019, the Court granted the following defendants' motion to dismiss: Defendants DeMill, Drake, Gurney, Laursen, and Merrill. (ECF No. 49.) The Court also denied the remaining defendants' motion to dismiss and ordered them to file a *Martinez* report[2] and summary-judgment motion. (*Id*.)

On June 17, 2019, as ordered, Defendants filed *Martinez* report, with fourteen exhibits, including declarations, prison records (e.g., medical), and grievance copies. (ECF Nos. 54-55.) On July 16, 2019, Defendants followed up with a summary-judgment motion. (ECF No. 56.) On October 30, 2019, now represented by counsel, (ECF No. 58), Plaintiff responded to the

---

[2] *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978) (approving district court's practice of ordering prison administration to prepare report to be included in pleadings in cases when prisoner has filed suit alleging constitutional violation against institution officials).

In *Gee v. Estes*, 829 F.2d 1005 (10th Cir. 1987), the Tenth Circuit explained MR's function, saying:

> Under the *Martinez* procedure, the . . . judge . . . will direct prison officials to respond in writing to the various allegations, supporting their response by affidavits and copies of internal disciplinary rules and reports. The purpose of the *Martinez* report is to ascertain whether there is a factual as well as a legal basis for the prisoner's claims. This, of course, will allow the court to dig beneath the conclusional allegations. These reports have proved useful to determine whether the case is so devoid of merit as to warrant dismissal without trial.

*Id.* at 1007.

summary-judgment motion, with argument, declarations, and medical records.[3] (ECF No. 72.)

On November 25, 2019, Defendants replied, including more medical and prison records. (ECF

Nos. 76-77.)

## II. SUA SPONTE DISMISSAL

The amended complaint requests declaratory and injunctive relief. (ECF No. 28, at 16,

18, 26.) Defendants respond with documents showing Plaintiff is no longer at Utah State Prison

(USP), as he was paroled on June 19, 2018. (ECF Nos. 56, at 18; 77-6, at 2.)

> "Mootness is a threshold issue because the existence of a
> live case or controversy is a constitutional prerequisite to federal
> court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d
> 863, 867 (10th Cir. 1996). "This requirement exists at all stages of
> federal judicial proceedings, and it is therefore not enough that the
> dispute was alive when the suit was filed; the parties must continue
> to have a personal stake in the outcome." *Id.*
>
> "Where a plaintiff seeks an injunction, his susceptibility
> to *continuing* injury is of particular importance--past exposure to
> illegal conduct does not in itself show a present case or
> controversy regarding injunctive relief if unaccompanied by any
> continuing, present adverse effects." *Jordan v. Sosa*, 654 F.3d
> 1012, 1024 (10th Cir. 2011) (brackets, ellipses and internal
> quotation marks omitted). "Moreover, a plaintiff's continued
> susceptibility to injury must be reasonably certain; a court will not
> entertain a claim for injunctive relief where the allegations take it
> into the area of speculation and conjecture." *Id.* (internal quotation
> marks omitted). In other words, "[a] claim for equitable relief is
> moot absent a showing of irreparable injury, a requirement that
> cannot be met where there is no showing of any real or immediate
> threat that the plaintiff will be wronged again." *Id.* (internal
> quotation marks omitted).

---

[3] Plaintiff's response requests denial of the summary-judgment motion, and, alternatively, "that the court defer ruling on the motion until sufficient opportunity be had to conduct necessary discovery." (ECF No. 72, at 1; *see id.* at 43 & 48.) However, (1) he does not hint what further discovery may be needed; and (2) he got three time extensions between the summary-judgment motion's filing on July 16, 2019, (ECF No. 56), and response's filing on October 30, 2019, (ECF No. 72). The Court freely gave extensions. If Plaintiff needed more discovery, he should have asked before the response was filed, not within the response. Plaintiff has had plenty of time to request more discovery, since case's submission on February 24, 2015, (ECF No. 1), and counsel's first appearance on August 7, 2019, (ECF No. 58). Thus, no further discovery is allowed.

> The mootness doctrine also applies to claims for declaratory relief. "When we apply the mootness doctrine in the declaratory judgment context . . . what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of *the defendant toward the plaintiff." Id.* at 1025 (brackets and internal quotation marks omitted). But as a first step, "the availability of [declaratory] relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).

*Burnett v. Fallin*, 785 F. App'x 546, 551-52 (10th Cir. 2019) (unpublished).

Defendants are right that all Plaintiff's requests for declaratory and injunctive relief are mooted by his release from prison. *See McAlpine v. Thompson*, 187 F.3d 1213, 1215 (10th Cir. 1999). Those requests are thus dismissed.

### III. SUMMARY JUDGMENT

### A. REMAINING DEFENDANTS & CLAIMS

Here is what remains: claims for damages against Defendants Bonkosky (medical claim); Clark (medical); Douglas (medical); Green (retaliation claim); Hughes (retaliation); Tubbs (medical); Wendler (medical).

### B. QUALIFIED IMMUNITY

Based on qualified immunity, the remaining defendants move for summary judgment on the unresolved claims against them. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

4

> *Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests--[1] the need to hold public officials accountable when they exercise power irresponsibly and [2] the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The purpose of the doctrine is to provide government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).
>
> "Because the focus had is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted). When a defendant raises the qualified immunity defense, the plaintiff must therefore establish (1) the defendant violated a federal statutory or constitutional right and (2) the right was clearly established at the time of the defendant's conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Under this two-part test, "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

*Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020).

> The test imposes a "heavy two-part burden." *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (internal quotation marks omitted). If the plaintiff fails to satisfy either part of the two-part inquiry, a court must grant the defendant qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first. *See Pearson*, 555 U.S. at 236. "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment...." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

*Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018); *see also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) ("Only if plaintiff makes that threshold showing does the burden shift to defendants to show that no material facts remain in dispute that would

defeat defendant's claim of qualified immunity.") (citing *Jantz v. Muci*, 976 F.2d 623, 627 (10th

Cir. 1992)).

To educate Plaintiff about his duty in responding to the summary-judgment motion, the

Court stated in an order,

> Plaintiff is notified that if Defendants move for summary judgment
> Plaintiff may not rest upon the mere allegations in the complaint.
> Instead, as required by Federal Rule of Civil Procedure 56(e), to
> survive a motion for summary judgment Plaintiff must allege
> specific facts, admissible in evidence, showing that there is a
> genuine issue remaining for trial.

(ECF No. 26, at 6.)

The inadequate-medical-treatment claims are brought under the Eighth Amendment's

proscription on cruel and unusual punishment. U.S. Const. amend. VIII. ("Excessive bail shall

not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

The retaliation claims are brought under the First Amendment's proscription on visiting

prejudicial consequences upon an inmate for filing a grievance. *See Kee v. Raemisch*, 793 F.

App'x 726, 730 (10th Cir. 2019) (unpublished) (citing U.S. Const. amend. I, stating, "Congress

shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to

petition the Government for a redress of grievances").

Regarding both sets of claims, the Court focuses on prong one of the qualified-immunity

analysis--the violation of Plaintiff's federal constitutional rights--concluding that Plaintiff did not

establish this prong and therefore has not carried his burden on summary judgment.

### C. MATERIAL FACTS

### 1. INADEQUATE MEDICAL CARE

Analysis of Plaintiff's claims is based on the following relevant facts drawn from

evidence submitted by both parties:

• At relevant time, Plaintiff was USP inmate. (Am. Compl., ECF No. 28, at 4.)

• At relevant time, **Defendant Bonkosky** was USP EMT. (M-track notes, ECF 55-2, at 11.)

• At relevant time, **Defendant Clark** was USP clinician. (Clark Decl., ECF 54-10, at 2.)

• At relevant time, **Defendant Douglas** was USP RN. (Douglas Decl., ECF 54-11, at 2.)

• At relevant time, **Defendant Tubbs** was USP MD. (Tubbs Decl., ECF 54-9, at 2.)

• At relevant time, **Defendant Wendler** was USP EMT. (Wendler Decl., ECF 54-12, at 2.)
Wendler's "typical response to a non-emergent medical complaint in the pill line [was] to have
the inmate write down their concerns similar to an Inmate Care Request or ICR." (*Id*. at 3.) Once
inmate submitted ICR, Wendler would "later enter their complaint into the system for follow-up
or care as necessary[; a] Nurse read[] through the ICRs and if needed [would] follow up." *Id*. "As
an EMT [Wendler was] not allowed to prescribe medication." *Id*.

• 8/30/11 - Plaintiff reported to **Defendant Wendler** his (a) "substantial lower-left-side
abdominal pain and his belief that he had a kidney stone," (ECF No. 28, at 9); (b) "stage 4 renal
failure," (MacArthur Decl., ECF No. 72-1, at 3); and "history of repeat kidney stones which did
significant damage to [his] kidneys," (*id*.). However, Wendler did not "alert the infirmary,
perform an examination" or give pain medication. (ECF No. 28, at 9.) Plaintiff submitted ICR at
pill line but was not seen. (*Id*.) ICR List for dates between August 11 to November 30, 2011
shows no ICR submitted for August 30, 2011. (ECF Nos. 55-2, at 9; 55-4, at 111.)

• 8/31/11 - at 5:31PM, Plaintiff submitted ICR through **Defendant Wendler**. (*Id*.; ECF Nos.
55-2, at 9, 13; 55-4, at 111.) Plaintiff told Wendler that "flank pain was becoming increasingly
severe" and Plaintiff needed to see doctor. (ECF No. 72-1, at 3.) Wendler submitted ICR in
Plaintiff's words, stating, "having left flank pain I would like to rule out another kidney stone."
(ECF No. 55-2, at 13.) ICR was marked not urgent. (*Id*.)

• 8/31 through 9/7/11 - **Defendants Tubbs**'s medical opinion of this period:
        Kidney stones often move, and can become stuck, causing
      significant pain, and then "break free" and the pain will lessen.
      Even if suffering a kidney stone episode from August 31 to
      September 7, 2011, [Plaintiff] was never in significant medical

> distress or at risk. His stone could have passed naturally. When it
> was evident that further treatment was needed, he was sent to
> [University of Utah Medical Center ([UMC])].

(ECF No. 54-9, at 3-4.)

• 9/1/11 - Plaintiff submitted two ICRs at pill line, stating at 9:11AM "left flank pain 7/10"
and at 11:20AM "left flank pain 2-3/10." (ECF Nos. 28, at 9; 55-2, at 9, 11.) After Plaintiff told
**Defendant Bankosky**[4] that his "flank pain had increased to very severe," Bankosky called
**Defendant Douglas** in infirmary, who told Bankosky to give Plaintiff "urine dip test." (ECF
Nos. 28, at 9; 55-2, at 11-12; 72-1, at 4.) When test showed protein in Plaintiff's urine, Plaintiff
stated that was normal because of kidney disease, referring Bankosky to his medical records of
"stage-4 renal failure." (ECF Nos. 28, at 9-10; 72-1, at 5.) Consulting **Defendant Tubbs**,
Douglas diagnosed Plaintiff with urinary tract infection (UTI) without seeing Plaintiff. (*Id.* at
10.) Without seeing Plaintiff, Tubbs prescribed Septra antibiotic (three days) and
phenazopyridine tablets (seven days). (*Id.*; Grievance Resp., ECF No. 55-1, at 4; ECF Nos. 55-2,
at 12; 55-4, at 13; 77-3, at 3.) "Phenazopyridine . . . is used to treat pain, burning, increased
urination, and increased urge to urinate." (ECF No. 54-11, at 4.)

> It is medically reasonable to rule out [UTI] when an inmate is
> complaining of mild pain. It is not medically possible to determine
> as a matter of fact where self-described mild pain is coming from.
> The most plausible source is a UTI. . . . Inmates often claim kidney
> stones in an attempt to obtain narcotics for pain, rather than
> antibiotics for a UTI. This is why ruling out the UTI is medically
> necessary absent extreme pain and other symptoms. The medical
> records indicate that MacArthur was only in mild pain. The
> medical records also suggest it was [Tubbs's] medically reasonable
> opinion he was suffering a UTI.

(ECF No. 54-9, at 3-4.) Vitals were taken, Septra administered, and infirmary notified by
**Defendant Bonkosky**. (ECF No. 55-2, at 11, 13.)

• 9/2/11 - Plaintiff took first Septra dose, then reported reaction of neck and throat swelling
and breathing difficulty. (ECF No. 28, at 10.) He reported reaction to **Defendant Bonkosky** at
"night" but it was not reported or treated. (*Id.* at 10-11; ECF No. 72-1, at 5-6.)

• 9/3/11 - at 2AM, Plaintiff complained of difficulty breathing and swollen neck and was
"[c]leared to remain on unit." (ICR, ECF No. 55-1, at 2; ECF No. 55-7, at 128.) Nursing note of
this encounter gives oxygen level, heart rate, lung sounds ("equal and clear breath sounds");
describes "[n]o redness [or hives on] or swelling of neck, chest, or face"; and states "[b]reathing
does not appear labored"; Plaintiff "was able to converse freely with no signs of . . . distress";
Plaintiff reported history "of anxiety and panic attacks," along with "[r]ecent interpersonal . . .

---

[4] In his amended complaint, Plaintiff alleges he reported his pain to Defendant Wendler; however, USP medical
records show that the report was to Defendant Bonkosky. (ECF No. 55-2, at 11.)

problems with cellmate"; and "[i]nfirmary notified." (ECF Nos. 55-2, at 11; 55-7, at 128.) "The medical records evidence no allergic reaction." (ECF No. 54-9, at 4.)

• 9/7/11 - at 7:30AM, Initial Contact Report submitted: "Inmate was stating he was not feeling well, throwing up, pains in his flank," and, "Medical staff was notified." (ECF No. 72-3, at 1.) After Plaintiff collapsed, a blood test showed him in kidney failure, so he was taken to UMC where "CT" examination was done. (ECF No. 28, at 12-13; blood test r., ECF No. 55-2, at 6-7; ECF Nos. 55-3, at 4; 55-5, at 15.)

• 9/8/11 - UMC surgeon removed kidney stone, placed bilateral stents, and inserted Foley catheter into Plaintiff's penis. (ECF Nos. 28, at 13; 55-3, at 2-3.)

• 9/10/11 - Plaintiff discharged from UMC with instructions "on appropriate care of his Foley catheter" and "to follow up in 3 weeks with Urology for postoperative visit and Foley catheter removal." (ECF Nos. 55-3, at 5; 55-5, at 30 (stating Plaintiff should "continue" to use Foley catheter which "will [be] remove[d] at urology clinic"); 55-7, at 114 ("Foley to remain in place and will be removed by UMC nephrology at f/u.").) UMC's "Final Discharge Order and Patient Instructions" show handwritten notation, "Foley catheter to be removed by prison staff on Monday 9/12," crossed out. (ECF Nos. 55-7, at 171; 54-10, at 2.)

• 9/15/11 - UMC Chronic Kidney Disease Clinic report on post-surgery visit, explains diagnosis, CT scan and x-ray results, surgery, test results, and Foley catheter placement. (ECF Nos. 55-3, at 2-3; 55-4, at 9-10; 55-5, at 30.) Record states, "Patient will return to the renal clinic in two weeks for follow up." (ECF No. 54-10, at 3.)

• 9/29/11 - UMC kidney clinic note details follow-up visit, with lab results and report from Plaintiff "that he is doing well"; "still has Foley catheter in place and has not seen his urologist yet"; and next visit to renal clinic scheduled in two weeks. (ECF No. 55-4, at 2-3.)

• 10/1/11 - Plaintiff submitted ICR at pill line. (ECF No. 55-2, at 9.) Plaintiff seen by **Defendant Clark** for pain at penis tip, which showed "small ulcer." (ECF Nos. 28, at 13-14, 65; 54-10, at 3.) "U/A dip was positive for Leuks and blood." (ECF Nos. 55-4, at 61; 54-10, at 4.) Clark made "reasonable medical decision . . . to treat [for] possible" UTI and not return Plaintiff to UMC. (ECF No. 54-10, at 4.) Clark prescribed ciprofloxacin (three days) and tramadol (ten days). (ECF Nos. 28, at 14; 54-10, at 4; 77-3, at 5.) Clark noted, "Will switch cipro to 3 days only due to renal impairment. Will send out some viscus lidocaine as well." (*Id*. at 62.)

• 10/14/11 - UMC Urology visit remarks, "Right stent removed. Doing well. Continue weekly labs. Return to clinic in 3 weeks with labs." (ECF No. 55-4, at 49.)

• 10/20/11 - Plaintiff seen at UMC kidney clinic. (ECF No. 55-5, at 39.)

• 11/18/11 - Catheter and stent removed at UMC. (ECF Nos. 28, at 14; 55-4, at 20.)

## 2. RETALIATION

• At relevant time, **Defendant Green** was USP housing lieutenant. (ECF 54-13, at 2.)

• At relevant time, **Defendant Hughes** was USP housing captain. (ECF 54-14, at 2.)

• 6/16/14 - Plaintiff "out of bounds . . . away from his bunk talking to another inmate after his lock down time." (C-Note, ECF Nos. 55-6, at 2; 77-5, at 2.)

• 7/10/14 - Plaintiff filed grievance about policy requiring inmates eat on their bunks. (ECF Nos. 28, at 22; 72-1, at 14.)

• 7/14/14 - After **Defendant Green** called Plaintiff troublemaker and threatened to move him and reduce privilege level, Plaintiff filed grievance about Green's "threats and the personal attack." (ECF Nos. 28, at 22; 72-1, at 14-15.)

• 7/14/14 to 8/1/14 - **Defendants Green and Hughes** "engaged in a series of hostile harassment toward Plaintiff designed to force Plaintiff to drop his grievances." (ECF Nos. 28, at 22-23; 72-1, at 15.) Hughes was concerned "that MacArthur was stirring up the other inmates and encouraging them to disobey policy and orders." (ECF No. 54-14, at 2.)

• 7/31/14 - Level 1 grievance response by **Defendant Hughes**, denying remedies as to Plaintiff's allegations of harmful health effects of having "to eat at his bunk" at certain times. (ECF No. 55-8, at 9-10.)

• 8/1/14 - Plaintiff filed Level 1 grievance against **Defendant Hughes** for violating prison policy on "dereliction of duty since he refused to check the tapes or interview witnesses" as to Plaintiff's grievance against Defendant Green. (ECF Nos. 28, at 23; 72-1, at 16.) Hughes issued Level 1 grievance response about Plaintiff's grievance against **Defendant Green** for threatening him. (ECF No. 55-8, at 11.) Grievance response states, "Inmate MacArthur has a habit of being out of place and out of bounds. . . . If Inmate MacArthur followed the rules set down for where he is supposed to be according to his PML, unit rules, and/or disciplinary status[, t]here would not be an issue." (*Id.*)

• 8/7/14 - With no reason given, housing officers said **Defendant Hughes** told them to move Plaintiff from Oquirrh 5 to Oquirrh 3, and Plaintiff was moved. (ECF Nos. 28, at 23; 72-1, at 16; 77-6, at 2.) Grievance for "dereliction of duty" then returned to Plaintiff "saying it had not been recorded because [Plaintiff] no longer a resident of Oquirrh 5 and thus any grievances dealing with Oquirrh 5 or the Oquirrh 5 officers no longer had anything to do with [Plaintiff]." (Doc. No. 72-1, at 16.) "Oquirrh 3 Housing Unit is not a higher security housing unit. The only difference is that it is a two inmate per cell unit, where Oquirrh 5 Housing Unit is dormitory style. [Plaintiff] had no loss of privileges, no adverse impact at all with this move." (ECF Nos. 54-13, at 3; 54-14, at 3.) Plaintiff "was still allowed to work, advance through programming, etc., and advance and participate in education." (ECF No. 54-14, at 3.) Still, Oquirrh 5 inmates "could be

in the chapel all day every day," whereas, in Oquirrh 3, Plaintiff had "access once every 4 days to the chapel, gym, and library." (ECF No. 72-1, at 17.) Plaintiff filed Level 1 grievance alleging move was retaliatory. (ECF No. 55-8, at 2.)

• 9/2/14 - Twenty-six days later, Plaintiff moved to Wasatch B Block. (Location History R., ECF No. 55-7, at 191; ECF No. 77-6, at 2.)

• 9/7/14 - Level 1 grievance denied, stating, "MacArthur was moved for management reasons." (ECF No. 55-8, at 3.) Plaintiff stated Level 1 grievance not resolved and signed name. (*Id*. at 4.)

• 9/13/14 - Plaintiff filed Level 2 grievance that housing move was retaliatory. (*Id*. at 5.)

• 10/1/14 - Level 2 grievance denied. (*Id*. at 6.)

• 10/10/14 - Level 3 grievance filed alleging housing move was retaliatory. (*Id*. at 7.)

• 10/29/14 - Level 3 grievance denied. (*Id*. at 8.)

### 3. RELEVANT FOLLOW-UP EVENTS

• 4/3/15 - Complaint filed. (ECF No. 5.)

• 5/30/18 -Amended Complaint filed. (ECF No. 28.)

• 6/14/19 - Plaintiff paroled. (ECF Nos. 54-13, at 3; 77-4, at 2.)

• 6/17/19 - *Martinez* report filed. (ECF Nos. 54-55.)

• 7/16/19 - Defendants' summary-judgment motion filed. (ECF No. 56.)

• 8/7/19 - Notice of appearance by Plaintiff's counsel. (ECF No. 58.)

• 8/16/19 - Plaintiff's time to respond to extended to 8/29/19. (ECF No. 62.)

• 8/29/19 - Plaintiff's time to respond to summary-judgment motion extended to 9/30/19. (ECF No. 64.)

• 10/14/19 - Plaintiff's time to respond to summary-judgment motion extended to 10/30/19. (ECF No. 69.)

• 10/30/19 - Filing of Plaintiff's response to Defendants' summary-judgment motion. (ECF No. 72.)

## D. ANALYSIS

## 1. INADEQUATE MEDICAL CARE

Two instances of inadequate medical care are alleged: (a) regarding treatment of kidney stone/UTI, from August 30 to September 7, 2011; and (b) regarding Foley catheter removal, after surgery on September 8, 2011.

### a. RECAP OF FACTS PER DEFENDANT

Before analyzing Plaintiff's attempt to carry his burden upon Defendants' assertion of the qualified-immunity defense, the Court first notes that Defendants are not to be lumped together as a group, but should be treated as individuals, each with his own inadequate-medical-care claim against him, based on his own behavior. *See Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (stating, because § 1983 is "vehicle[] for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants"); *Robbins v. Okla. ex rel. Dept' of Human Servs*., 519 F.3d 1242, 1250 (10th Cir. 2008) (stating complaint must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him . . . as distinguished from collective allegations") (emphasis in original) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007)); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532-33 (10th Cir. 1998) (holding district court's analysis of plaintiff's § 1983 claims was "infirm" where district court "lump[ed]" together plaintiff's claims against multiple defendants-- "despite the fact that each of the defendants had different powers and duties and took different actions with respect to [plaintiff]"--and "wholly failed to identify specific actions taken by particular defendants that could form the basis of [a constitutional] claim").

To ensure understanding that each defendant is responsible for only the allegations regarding himself, the relevant facts are restated below, grouped by defendant:

### i. Defendant Bankosky

• At relevant time, Bonkosky was USP EMT. (ECF 55-2, at 11.) EMT's "typical response to a non-emergent medical complaint in the pill line [was] to have the inmate write down their concerns similar to an [ICR]." (ECF 54-12, at 3.) Once inmate submitted ICR, EMT would "later enter their complaint into the system for follow-up or care as necessary[; a] Nurse read[] through the ICRs and if needed [would] follow up." *Id.* "EMT[s] . . . not allowed to prescribe medication." *Id.*

• 9/1/11 - Plaintiff submitted two ICRs at pill line, stating at 9:11AM "left flank pain 7/10" and at 11:20AM "left flank pain 2-3/10." (ECF Nos. 28, at 9; 55-2, at 9, 11.) After Plaintiff told Bankosky that "flank pain had increased to very severe," Bankosky called Defendant Douglas in infirmary, who told Bankosky to give Plaintiff "urine dip test." (ECF Nos. 28, at 9; 55-2, at 11-12; 72-1, at 4.) When test showed protein in urine, Plaintiff said that was normal because of Plaintiff's kidney disease, referring Bankosky to medical records of "stage-4 renal failure." (ECF Nos. 28, at 9-10; 72-1, at 5.) Consulting Defendant Tubbs, Douglas diagnosed Plaintiff with UTI without seeing Plaintiff. (*Id.* at 10.) Without seeing Plaintiff, Tubbs prescribed Septra antibiotic (three days) and phenazopyridine tablets (seven days). (*Id.*; ECF Nos. 55-1, at 4; 55-2, at 12; 55-4, at 13; 77-3, at 3.) "Phenazopyridine . . . is used to treat pain, burning, increased urination, and increased urge to urinate." (ECF No. 54-11, at 4.)

> It is medically reasonable to rule out [UTI] when an inmate is complaining of mild pain. It is not medically possible to determine as a matter of fact where self-described mild pain is coming from. The most plausible source is a UTI. . . . Inmates often claim kidney stones in an attempt to obtain narcotics for pain, rather than antibiotics for a UTI. This is why ruling out the UTI is medically necessary absent extreme pain and other symptoms. The medical records indicate that MacArthur was only in mild pain. The medical records also suggest it was [Tubbs's] medically reasonable opinion he was suffering a UTI.

(ECF No. 54-9, at 3-4.) Vitals were taken, Septra administered, and infirmary notified by Bonkosky. (ECF No. 55-2, at 11, 13.)

• 9/2/11 - Plaintiff took first Septra dose, then reported reaction of neck and throat swelling and breathing difficulty. (ECF No. 28, at 10.) He stated reaction to Bonkosky at "night" but it was not reported or treated. (*Id.* at 10-11; ECF No. 72-1, at 5-6.)

• 9/3/11 - at 2AM, Plaintiff complained of difficulty breathing and swollen neck and was "[c]leared to remain on unit." (ECF Nos. 5-1, at 2; 55-7, at 128.) Nursing note of encounter gives oxygen level, heart rate, lung sounds ("equal and clear breath sounds"); describes "[n]o redness

[or hives on] or swelling of neck, chest, or face,"; and states "[b]reathing does not appear labored"; Plaintiff "able to converse freely with no signs of . . . distress"; Plaintiff reported history "of anxiety and panic attacks," along with "[r]ecent interpersonal . . . problems with cellmate"; and "[i]nfirmary notified." (ECF Nos. 55-2, at 11; 55-7, at 128.) "The medical records evidence no allergic reaction." (ECF No. 54-9, at 4.)

### ii. Defendant Clark

• At relevant time, Clark was USP clinician. (ECF 54-10, at 2.)

• 10/1/11 - Plaintiff submitted ICR at pill line. (ECF No. 55-2, at 9.) Plaintiff seen by Clark for pain at penis tip, which showed "small ulcer." (ECF Nos. 28, at 13-14, 65; 54-10, at 3.) "U/A dip was positive for Leuks and blood." (ECF Nos. 55-4, at 61; 54-10, at 4.) Clark made "reasonable medical decision . . . to treat [for] possible" UTI and not return Plaintiff to UMC. (ECF No. 54-10, at 4.) Clark prescribed ciprofloxacin (three days) and tramadol (ten days). (ECF Nos. 28, at 14; 54-10, at 4; 77-3, at 5.) Clark noted, "Will switch cipro to 3 days only due to renal impairment. Will send out some viscus lidocaine as well." (*Id*. at 62.)

### iii. Defendant Douglas

• At relevant time, Douglas was USP RN. (ECF 54-11, at 2.)

• 9/1/11 - Douglas was called to infirmary and ordered Plaintiff to be given "urine dip test." (ECF Nos. 28, at 9; 55-2, at 11-12; 72-1, at 4.) Consulting Defendant Tubbs, Douglas diagnosed Plaintiff with UTI without seeing Plaintiff. (ECF No. 28, at 10.) Septra antibiotic (three days) and phenazopyridine tablets (seven days) were prescribed. (*Id*.; ECF Nos. 55-1, at 4; 55-2, at 12; 55-4, at 13; 77-3, at 3.)

### iv Defendant Tubbs

• At relevant time, Tubbs was USP MD. (ECF 54-9, at 2.)

• 8/31 through 9/7/11 - Tubbs's medical opinion of this period:

> Kidney stones often move, and can become stuck, causing significant pain, and then "break free" and the pain will lessen. Even if suffering a kidney stone episode from August 31 to September 7, 2011, [Plaintiff] was never in significant medical distress or at risk. His stone could have passed naturally. When it was evident that further treatment was needed, he was sent to [UMC].

(ECF No. 54-9, at 3-4.)

• 9/1/11 - Tubbs was consulted as to Plaintiff's report of left-flank pain and results of urine-dip test and diagnosed Plaintiff with UTI without seeing Plaintiff. (ECF No. 28, at 10.) Tubbs

prescribed Septra antibiotic (three days) and phenazopyridine tablets (seven days). (*Id.*; ECF Nos. 55-1, at 4; 55-2, at 12; 55-4, at 13; 77-3, at 3.) "Phenazopyridine . . . is used to treat pain, burning, increased urination, and increased urge to urinate." (ECF No. 54-11, at 4.)

> It is medically reasonable to rule out [UTI] when an inmate is complaining of mild pain. It is not medically possible to determine as a matter of fact where self-described mild pain is coming from. The most plausible source is a UTI. . . . Inmates often claim kidney stones in an attempt to obtain narcotics for pain, rather than antibiotics for a UTI. This is why ruling out the UTI is medically necessary absent extreme pain and other symptoms. The medical records indicate that MacArthur was only in mild pain. The medical records also suggest it was [Tubbs's] medically reasonable opinion he was suffering a UTI.

(ECF No. 54-9, at 3-4.)

### v. Defendant Wendler

• At relevant time, Wendler was USP EMT. (ECF 54-12, at 2.) Wendler's "typical response to a non-emergent medical complaint in the pill line [was] to have the inmate write down their concerns similar to an [ICR]." (*Id.* at 3.) Once inmate submitted ICR, Wendler would "later enter their complaint into the system for follow-up or care as necessary[; a] Nurse read[] through the ICRs and if needed [would] follow up." *Id.* "As an EMT [Wendler was] not allowed to prescribe medication." *Id.*

• 8/30/11 - P reported to Wendler his (a) "substantial lower-left-side abdominal pain and his belief that he had a kidney stone," (ECF No. 28, at 9); (b) "stage 4 renal failure," (ECF No. 72-1, at 3); and "history of repeat kidney stones which did significant damage to [his] kidneys," (*id.*). However, Wendler did not "alert the infirmary, perform an examination" or give pain medication. (ECF No. 28, at 9.) Plaintiff submitted ICR at pill line but was not seen. (*Id.*) ICR List for dates between August 11 to November 30, 2011 shows no ICR submitted for August 30, 2011. (ECF Nos. 55-2, at 9; 55-4, at 111.)

• 8/31/11 - at 5:31PM, Plaintiff submitted ICR through Wendler. (*Id.*; ECF Nos. 55-2, at 9, 13; 55-4, at 111.) Plaintiff told Wendler that "flank pain was becoming increasingly severe" and Plaintiff needed to see doctor. (ECF No. 72-1, at 3.) Wendler submitted ICR in Plaintiff's words, stating, "having left flank pain I would like to rule out another kidney stone." (ECF No. 55-2, at 13.) ICR was marked not urgent. (*Id.*)

• 8/31 through 9/7/11 - Defendants Tubbs's medical opinion of this period:

> Kidney stones often move, and can become stuck, causing significant pain, and then "break free" and the pain will lessen. Even if suffering a kidney stone episode from August 31 to September 7, 2011, [Plaintiff] was never in significant medical distress or at risk. His stone could have passed naturally. When it

was evident that further treatment was needed, he was sent to [UMC].

(ECF No. 54-9, at 3-4.)

• 9/1/11 - Plaintiff submitted two ICRs at pill line, stating at 9:11AM "left flank pain 7/10" and at 11:20AM "left flank pain 2-3/10." (ECF Nos. 28, at 9; 55-2, at 9, 11.) After Plaintiff told Defendant Bankosky that "flank pain had increased to very severe," Bankosky called Defendant Douglas in infirmary, who, with Tubbs, diagnosed and treated Plaintiff for UTI. (ECF Nos. 28, at 9-10; 55-2, at 11-12; 72-1, at 4.)

### b. PLAINTIFF'S BURDEN ON ASSERTION OF QUALIFIED IMMUNITY

Trying to avert summary judgment against him, Plaintiff argues that each Medical Defendant violated his federal constitutional right to adequate medical care.

### i. LEGAL STANDARD

The Eighth Amendment's ban on cruel and unusual punishment requires prison officials to "provide humane conditions of confinement" including "adequate . . . medical care." *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998)) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998)). To state a cognizable claim under the Eighth Amendment for failure to provide proper medical care, "a prisoner must allege acts or omissions *sufficiently harmful* to evidence deliberate indifference to serious medical needs." *Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993) (emphasis in original) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Any Eighth Amendment claim must be evaluated under objective and subjective prongs: (1) "Was the deprivation sufficiently serious?" And, if so, (2) "Did the officials act with a sufficiently culpable state of mind?" *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Under the objective prong, a medical need is "sufficiently serious . . . if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209

(citations and quotation marks omitted).

The subjective prong requires Plaintiff to show that prison officials were consciously

aware that he faced a substantial risk of harm and wantonly disregarded the risk "by failing to

take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

"'[I]nadvertent failure to provide adequate medical care' tantamount to negligence does not

satisfy the deliberate indifference standard." *Sparks v. Singh*, 690 F. App'x 598, 604 (10th Cir.

2017) (unpublished) (quoting *Estelle*, 429 U.S. at 105–06). Further, "a prisoner who merely

disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional

violation." *Perkins v. Kan. Dep't of Corrs.,* 165 F.3d 803, 811 10th Cir. 1999); *see also Gee v.

Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) (stating disagreeing with doctor's particular

treatment method, without more, does not rise to level of Eighth Amendment violation).

Delay in receiving treatment is cognizable only if the delay was caused by deliberate

indifference and resulted in substantial harm. *Olson,* 9 F.3d at 1477. "[I]n the context of a missed

diagnosis or delayed referral, there must be direct or circumstantial evidence that 'the need for

additional treatment or referral to a medical specialist is obvious,'" and "'where a doctor merely

exercises his considered medical judgment,'" no deliberate indifference exists. *Sparks*, 690 F.

App'x at 604 (quoting *Self v. Crum*, 439 F.3d 1227, 1231-32 (10th Cir. 2006)).

"A prison medical professional who serves solely as a gatekeeper for other medical

professionals capable of treating the condition may be held liable under the deliberate

indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata v. Saiz*, 427

F.3d 745, 751 (10th Cir. 2005). Delayed care constitutes a constitutional violation only when

the inmate shows the delay ended in "substantial harm," which means "'lifelong handicap,

permanent loss, or considerable pain.'" *Id* at 751 (quoting *Garrett v. Stratman*, 254 F.3d 946, 950

(10th Cir. 2001)).

### ii. APPLYING LAW TO FACTS

As EMTs who primarily took ICRs and could not prescribe medicine, Defendants

Bankosky and Wendler both fit the definition of "gatekeeper." The relevant question as to each

of them is whether they caused delayed care that ended in "substantial harm." *See id*.

**Defendant Bankosky**. Once Plaintiff told Bankosky on September 1, 2011 that he had

severe left flank pain and kidney disease, Bankosky contacted Defendant Douglas and did a

urine-dip test at Douglas's direction. (ECF Nos. 28, at 9-10; 55-2, at 11-12; 72-1, at 4.) He took

vitals, administered the Septra prescribed by Defendant Tubbs, and notified the infirmary. (ECF

No. 55-2, at 11, 13.) This undisputed factual scenario does not show that Bankosky delayed care

but instead that, as a gatekeeper, he was responsive to Plaintiff's assertions of pain and possible

kidney malfunction.

Plaintiff further alleges that, after he took his first Septra dose on the night of September

2, 2011, he reported to Bankosky a reaction of neck and throat swelling and breathing difficulty,

yet nothing was done. (ECF Nos. 28, at 10-11; 72-1, at 5-6.) However, prison medical records

show that on September 3, 2011, at 2 AM, Plaintiff complained of difficulty breathing and was

"[c]leared to remain on unit." (ECF No. 55-1, at 2.) Further, nursing note of this encounter gives

oxygen level, heart rate, lung sound; describes "[n]o redness or swelling of neck, chest, or face,";

and states "[b]reathing does not appear labored," Plaintiff reported history "of anxiety and panic

attacks," along with "[r]ecent interpersonal . . . problems with cellmate"; and "[i]nfirmary

notified." (ECF No. 55-2, at 11.) "The medical records evidence no allergic reaction." (ECF No. 54-9, at 4.) This undisputed factual evidence shows that, though Bankosky may have failed to act while it was still the night of September 2, a nurse fully vetted Plaintiff's health concern by two in the morning on September 3. The notes from that encounter reveal that Plaintiff's neck and throat swelling, together with any breathing difficulty, was not noticeable and may even have been anxiety related, as opposed to the allergic reaction that Plaintiff feared. Any clearly short delay between Plaintiff's report to Bankosky and medical evaluation was thus not substantially harmful, as a matter of law.

**Defendant Wendler**. Plaintiff's allegations about Wendler regard his unheeded reports to Wendler on two separate days--August 30 and 31, 2011--of left flank pain, kidney disease, and potential of damaging kidney stones. (ECF Nos. 28, at 9; 72-1, at 3.)

First, it is undisputed that Wendler functioned as a gatekeeper who primarily took requests to pass along to medical professionals for application of their advanced education and experience. (ECF 54-12, at 2.) Wendler's "typical response to a non-emergent medical complaint in the pill line [was] to have the inmate write down their concerns similar to an Inmate Care Request or ICR." (*Id*. at 3.) Once inmate submitted ICR, Wendler would "later enter their complaint into the system for follow-up or care as necessary[; a] Nurse read[] through the ICRs and if needed [would] follow up." *Id*. "As an EMT [Wendler was] not allowed to prescribe medication." *Id*.

Taken only from the amended complaint, signed December 26, 2017 (more than six years after relevant events), (ECF No. 28), and personal declaration, dated August 28, 2019 (eight years later), (ECF No. 72-1), Plaintiff's story of August 30-31, 2011, is one of consistent, urgent

reports to Wendler of unheeded pain. The story is at odds with Plaintiff's contemporaneous

medical records from those two days. Indeed, Plaintiff's story is supported solely by his after-

the-fact, self-serving sworn statements. Such statements in the affidavit of a nonmovant, like

Plaintiff, are insufficient to support Plaintiff's allegations against Wendler. *See Sherman v.

Klenke*, 653 F. App'x 580, 585-86 (10th Cir. 2016) (unpublished) ("A nonmovant can properly

oppose [SJ] with affidavits, but . . . conclusory and self-serving affidavits are not sufficient.");

*Boles v. Dansdill*, 361 F. App'x 15, 18 (10th Cir. 2010) (unpublished) (stating "conclusory and

self-serving affidavits" do not serve as "objective evidence" upon which SJ may be based);

*Thomas v. United States Bureau of Prisons*, 282 F. App'x 701, 704 (10th Cir. 2008)

(unpublished) (relying on contemporaneous medical records over "conclusory and self-serving

statements" in Plaintiff's affidavit); *Cahill v. Nye*, No. 99-3059, 2000 U.S. App LEXIS 2481, at

*3-4 (10th Cir. Feb. 17, 2000) (unpublished) ("When 'the record taken as a whole could not lead

a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'"

(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986))); *Oates v.

Englund*, No. 99-1187, 1999 U.S. App. LEXIS 24645, at *3 (10th Cir. Oct. 4, 1999)

(unpublished) (stating, when plaintiff "has offered nothing to support his conclusory and self-

serving allegation," plaintiff's affidavit is "not sufficient to create a genuine issue of fact").

Regarding August 30, 2011, Plaintiff's self-serving, six-to-eight-years-later statements

say that Plaintiff reported to Wendler his substantial left flank pain and history of kidney disease,

but Wendler did not provide any help. (ECF Nos. 28, at 9; 72-1, at 3.) Plaintiff also stated that he

submitted an ICR at pill line but was not seen. (ECF No. 28, at 9.) However, the ICR list, for

dates between August 11 to November 30, 2011, shows no ICR submitted for August 30, 2011.

(ECF Nos. 55-2, at 9; 55-4, at 111.) Thus, the contemporaneous medical records do not support Plaintiff's version of relevant events on August 30, 2011. The record clearly shows that Plaintiff submitted many ICRs and knew that submission of an ICR was necessary to receive infirmary review. Even if Plaintiff reported his pain and kidney issues to Wendler on that date, he did not take the required step of submitting an ICR for further evaluation by more qualified medical staff.

Then, on August 31, 2011, at 5:31PM, Plaintiff submitted an ICR through Wendler. (*Id.*; ECF Nos. 55-2, at 9, 13; 55-4, at 111.) Again, Plaintiff's self-serving, eight-years-later declaration says that Plaintiff told Wendler that his pain was "increasingly severe" and he needed to see a doctor, (ECF No. 72-1, at 3); however, the contemporaneous ICR states, in Plaintiff's words, "having left flank pain I would like to rule out another kidney stone," (ECF No. 55-2, at 13.) And, the ICR was marked not urgent. (*Id.*) It is undisputed that Wendler's job as an EMT meant that ICRs passed through him to more specialized medical staff to review for possible treatment. The ICR's designation as not urgent means that Wendler would have passed the ICR along for routine review.

It is further undisputed that the very next morning, on September 1, 2011--hours after Plaintiff allegedly reported "substantial" pain to Wendler--Plaintiff received in-person triage, a urine test, a diagnosis of UTI, and prescriptions. (*See* ECF No. 55-2, at 12.)

The "delay" in treatment of a non-emergent request was a matter of hours. "A prison medical professional who serves solely as a gatekeeper for other medical professional capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir.

2005). Delayed care constitutes a constitutional violation only when the inmate shows the delay

ended in "substantial harm," which means "lifelong handicap, permanent loss, or considerable

pain." *Id* at 751.

Upon receiving Plaintiff's August 31, 2011 request for medical treatment, Wendler

passed along the ICR, according to practice. Based on the contemporaneous evidence, the only

symptom Wendler personally had been notified of was that Plaintiff had left flank pain and,

based on his history, wondered if he had a kidney stone. His contemporaneous words did not

suggest an emergency, considerable pain, or fear of permanent loss or handicap.

So Wendler adequately fulfilled his gatekeeper role: When told that Plaintiff had left

flank pain and wondered if he had a kidney stone, Wendler passed along his request for medical

care. "The available evidence fails to support a reasonable inference that Defendant [Wendler]

knew that a doctor's care was more urgently needed and that []he recklessly disregarded such a

need." *Winrow v. Stell*, No. CIV-13-1144-D, 2015 U.S. Dist. LEXIS 75710, at *89-92 (W.D.

Okla. March 5, 2015) (R. & R.), *adopted by* 2015 U.S. Dist. LEXIS 74945 (June 10, 2015). As

such, Wendler's actions "cannot be said to constitute 'an unnecessary and wanton infliction of

pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105. Plaintiff has

not shown that Wendler "intentionally withheld medical treatment in order to inflict pain or harm

upon him." *Narduzzi v. Smith*, No. 1:14cv-1349, 2015 U.S. Dist. LEXIS 128390, at *14 (M.D.

Pa. Sept. 24, 2015); *see Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

**Defendants Clark, Douglas, and Tubbs**. The parsing of Plaintiff's allegations per

defendant remains important here.

The allegation that appears to match up with Clark regards the delayed removal of Plaintiff's Foley catheter after it was inserted by a UMC MD during surgery on September 8, 2011. (ECF Nos. 28, at 13; 55-3, at 2-3.) Undisputed, contemporaneous medical records show that UMC's discharge instructions state that the Foley catheter would be removed at a future time at the UMC urology clinic. (ECF Nos. 54-10, at 2; 55-3, at 5; 55-5, at 30 (stating Plaintiff should "continue" to use Foley catheter which "will [be] remove[d] at urology clinic"); 55-7, at 114 ("Foley to remain in place and will be removed by UMC nephrology at f/u."); 55-7, at 171.)

The one time that Clark interacted with Plaintiff regarding this allegation was on October 11, 2011, after Plaintiff submitted an ICR. (ECF No. 55-2, at 9.) Clark examined Plaintiff's penis tip and observed a "small ulcer." (ECF Nos. 28, at 13-13, 65; 54-10, at 3.) He effected a urine test that showed existence of "Leuks and blood." (ECF Nos. 55-4, at 61; 54-10, at 4.) He diagnosed a UTI and prescribed medication. (ECF Nos. 28, at 14; 54-10, at 4; 77-3, at 5.) He did not remove the catheter, but would not have expected to. After all, UMC's discharge instructions stated UMC staff would do it. (ECF Nos. 54-10, at 2; 55-3, at 5; 55-5, at 30 (stating Plaintiff should "continue" to use Foley catheter which "will [be] remove[d] at urology clinic"); 55-7, at 114 ("Foley to remain in place and will be removed by UMC nephrology at f/u."); 55-7, at 171.) And, Plaintiff's medical records would have shown Plaintiff's ongoing follow-up visits to UMC urology staff, who presumably would remove the catheter when warranted by their medical judgment. (ECF Nos. 54-10, at 3; 55-3, at 2-3; 55-4, at 2-3, 9-10, 20, 49; 55-5, at 30, 39.)

The allegations that appear to match up with Douglas and Tubbs regard treatment of kidney stone/UTI, from August 30 through September 7, 2011.

The one time that Douglas and Tubbs interacted with Plaintiff as to this allegation was September 1, 2011, after Douglas was called to the infirmary about Plaintiff's left flank pain and concern about a potential kidney stone. (ECF Nos. 28, at 9, 10; 55-2, at 11-12; 72-1, at 4.) Douglas ordered a urine test, and consulted with Tubbs, who collaborated to diagnose a UTI and prescribe medication. (*Id.*; ECF Nos. 55-1, at 4; 55-4, at 13; 77-3, at 3.) Tubbs further offered in his declaration his more general medical opinion about how kidney stones and UTIs are identified and treated. (ECF No. 54-9, at 3-4.)

As to the allegations against Clark, Douglas, and Tubbs, the Court concludes that these defendants did not provide constitutionally inadequate medical care. Based on the undisputed facts--supported by hundreds of pages of medical records and declarations that the Court has thoroughly reviewed--this Court cannot term these defendants as deliberately indifferent to Plaintiff's requests for treatment for urological conditions. To the contrary, as requested, these three defendants either met with and treated Plaintiff themselves or actively consulted--i.e., examinations were performed, tests were done, and prescriptions authorized and dispensed.

Far from "deliberate indifference"--"the unnecessary and wanton infliction of pain"-- the record shows Clark, Douglas and Tubbs ensuring treatment for Plaintiff's symptoms. *Estelle*, 429 U.S. at 104 (quotation marks & citation omitted). They may not have provided the exact medication or dosage or other treatment that Plaintiff wanted, but the medical care was uniformly adequate: Plaintiff's expressed need for help with pain and discomfort was met by Defendants. Plaintiff disputes this, but his allegations are entirely unsupported.

Plaintiff's point really is that he, as an unqualified layperson, wanted more or different treatment from the medical-professional defendants--not, as it must be shown to prevail, that

Defendants, with full knowledge of the deleterious effects of their actions or inactions, outright ignored or even exacerbated Plaintiff's serious medical needs (assuming the needs were serious). *Id.* at 107 (stating that, when inmate contended "that more should have been done by way of diagnosis and treatment" and "suggest[ed] a number of options that were not pursued, that was "classic example of a matter for medical judgment . . . and does not represent cruel and unusual punishment"). As a matter of law, Clark, Douglas, and Tubbs's treatment of Plaintiff, as it is set forth in undisputed evidentiary submissions, simply cannot be said to "offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id*. at 106.

Thus, under qualified-immunity analysis, Plaintiff has not shown that these government officials violated a constitutional right. They therefore are entitled to qualified immunity. And, the inadequate-medical-care claims against Defendants Bonkosky, Clark, Douglas, Tubbs and Wendler are dismissed.

## 2. RETALIATION

Plaintiff asserts that Defendants Green and Hughes moved him to less attractive housing to punish him for filing grievances, resulting in a civil-rights cause of action for retaliation against each defendant.

### a. RECAP OF FACTS PER DEFENDANT

#### i. Defendant Green

• At relevant time, Green was USP housing lieutenant. (ECF 54-13, at 2.)

• 7/14/14 - After Green called Plaintiff troublemaker and threatened to move him and reduce privilege level, Plaintiff filed grievance about Green's "threats and the personal attack." (ECF Nos. 28, at 22; 72-1, at 14-15.)

• 7/14//14 to 8/1/14 - Green "engaged in a series of hostile harassment toward Plaintiff designed to force Plaintiff to drop his grievances." (ECF Nos. 28, at 22-23; 72-1, at 15.)

### ii. Defendant Hughes

• At relevant time, Hughes was USP housing captain. (ECF 54-14, at 2.)

• 7/14//14 to 8/1/14 - Hughes "engaged in a series of hostile harassment toward Plaintiff designed to force Plaintiff to drop his grievances." (ECF Nos. 28, at 22-23; 72-1, at 15.) Hughes was concerned "that MacArthur was stirring up the other inmates and encouraging them to disobey policy and orders." (ECF No. 54-14, at 2.)

• 7/31/14 - Level 1 grievance response by Defendant Hughes, denying remedies regarding Plaintiff's allegations of "harmful" health effects from having "to eat at his bunk" during certain times. (ECF No. 55-8, at 9-10.)

• 8/1/14 - Plaintiff filed Level 1 grievance against Hughes for violating prison policy on "dereliction of duty since he refused to check the tapes or interview witnesses" regarding Plaintiff's grievance against Defendant Green. (ECF Nos. 28, at 23; 72-1,at 16.) Level 1 grievance response issued by Hughes regarding Plaintiff's grievance against Defendant Green for threatening him. (ECF No. 55-8, at 11.) Grievance response states, "Inmate MacArthur has a habit of being out of place and out of bounds. . . . If Inmate MacArthur followed the rules set down for where he is supposed to be according to his PML, unit rules, and/or disciplinary status[, t]here would not be an issue." (*Id*.)

• 8/7/14 - With no reason given, housing officers told Plaintiff that Hughes ordered them to move Plaintiff from Oquirrh 5 to Oquirrh 3, and Plaintiff was moved. (ECF Nos. 28, at 23; 72-1, at 16; 77-6, at 2.)

### b. PLAINTIFF'S BURDEN ON ASSERTION OF QUALIFIED IMMUNITY

Trying to avert summary judgment against him, Plaintiff argues that Defendants Green and Hughes each violated his federal constitutional right to grieve prison officials' behavior without suffering retaliation.

### i. LEGAL STANDARD

"It is well-settled that '[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right [to free speech].'" *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010) (quoting *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990)). To show retaliation, Plaintiff must prove three elements: (1) Plaintiff was involved in "constitutionally

protected activity"; (2) Defendants' behavior injured Plaintiff in a way that "would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Defendants' injurious behavior was "substantially motivated" as a reaction to Plaintiff's constitutionally protected conduct. *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

### ii. APPLYING LAW TO FACTS

Plaintiff contends that Defendants Green and Hughes each violated his First Amendment rights by retaliating against him for filing grievances. The Court accepts as a given, for purposes of this Order only, that element one has been met: Plaintiff was involved in grieving, a constitutionally protected activity.

**Defendant Green**. Assessing element two of the retaliation cause of action, the Court concludes that, accepting Plaintiff's factual allegations as true, Plaintiff has not shown that Green unconstitutionally retaliated against him. First, Plaintiff has not alleged that Green's behavior injured him at all. His allegations instead are that Green threatened to move him and reduce his privilege level (based on Plaintiff's filing of the grievance about eating on his bunk), not that Green *actually* moved him and reduced his privilege level. (*See* ECF Nos. 28, at 22; 72-1, at 14-15.) Once he filed another grievance--this time, about Green's threats regarding the bunk grievance--he alleges that Green "engaged in a series of hostile harassment toward Plaintiff designed to force Plaintiff to drop his grievances." (ECF Nos. 28, at 22-23; 72-1, at 15.) He does not specify Green's actions, but, most importantly, does not state that Green's supposed intent to get Plaintiff to drop his grievances had that result. And, indeed, if that was Green's intent, it did not get Plaintiff to drop his grievances. Plaintiff instead, as he himself asserts, went on to pursue

his grievances and file yet another grievance (against Defendant Hughes). (ECF Nos. 28, at 22-23; 55-8, at 2, 5, 7; 72-1, at 14-16.)

So, under element two, Plaintiff has neither alleged that Green's unspecified behavior was injurious to him, nor that a person of ordinary firmness would have been chilled from continuing to engage in grieving activities. *See Gray v. Geo Grp., Inc.*, 727 F. App'x 940, 947 (10th Cir. 2018) (unpublished) (concluding "vague and conclusory" allegations "fail to explain why . . . misconduct . . . identifie[d] would chill a person of ordinary firmness from continuing to engage in the protected activity"). Plaintiff has thus not carried his burden on Green's assertion of qualified immunity of showing that Green violated his constitutional right to grieve without retaliation.

**Defendant Hughes**. The same analysis regarding element two applies to Hughes. Regardless of the fact that Hughes is the one who allegedly specifically ordered Plaintiff moved to other housing (Oquirrh 3, from Oquirrh 5), again, Plaintiff, as he himself asserts, went on to pursue his grievances and file yet another grievance (against Hughes's decision to move him). (ECF Nos. 28, at 22-23; 55-8, at 2, 5, 7; 72-1, at 14-16.) Further, the undisputed facts show that the move was not, in fact, injurious. After all, Oquirrh 3 was not higher security; resulted in no loss of privileges, as Plaintiff "was still allowed to work, advance through programming . . . and participate in education"; and still had access to "chapel, gym and library." (ECF Nos. 54-14; 72-1, at 17.) Moreover, twenty-six days after being moved to Oquirrh 3, he was moved on to Wasatch B Block, a move that is not at issue here. (*See* ECF Nos. 55-7, at 191; 77-6, at 2.) Though Plaintiff was clearly unhappy to move from Oquirrh 5 to Oquirrh 3, the move was for less than a month, which seems particularly inconsequential when the only notable difference

between Oquirrh 5 and 3 was going from dormitory-style living to a cell with one other inmate,
(ECF Nos. 54-13, at 3, 54-14, at 3; 55-7, at 191; 77-6, at 2). "A trivial or de minimus injury . . .
is not sufficient to support a retaliation claim. *Johnson v. Whitney*, 723 F. App'x 587, 595 (10th
Cir. 2018) (unpublished); *cf. Allen v. Avance*, 491 F. App'x 1, 6 (10th Cir. 2012) (unpublished)
(stating "prospect of punishment severe enough to satisfy the Eighth Amendment is sufficient to
chill a person of ordinary firmness from exercising his constitutional rights," but Plaintiff's move
here would not be considered cruel and unusual punishment) (internal quotation marks deleted);
*see, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (holding Eighth Amendment violation is
deliberate indifference to serious harm).

     The Court jumps next to the third element of retaliation--"but-for" motivation. *See Ellis
v. Franco*, No. CIV 15-0848, 2017 U.S. Dist. LEXIS 108683, at \*19 (D.N.M. July 12, 2017) (R.
& R.), *adopted by* 2017 U.S. Dist. LEXIS 127320 (Aug. 10, 2017). The consideration here is
whether (based on undisputed material facts) Hughes's behavior (i.e., moving Plaintiff to other
housing) was *substantially motivated* by a wish to deter Plaintiff's grievance filings.

     "[I]t is not the role of the federal judiciary to scrutinize and interfere with the daily
operations of a state prison." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998). Thus,
"to satisfy the third prong of the First Amendment test, an inmate must allege specific facts
showing that '*but for* the retaliatory motive, the incidents to which he refers . . . would not have
taken place.'" *Banks v. Katzenmeyer*, 645 F. App'x 770, 772 (10th Cir. 2016) (emphasis added)
(quoting *Peterson,* 149 F.3d at 1144 (internal quotation marks omitted)). This is a "heightened
standard" that requires Plaintiff to show "a triable issue not only that retaliation for [filing of
grievances] played a role in [moving Plaintiff to other housing] but that such retaliation was the

decisive factor." *Strope v. McKune*, 382 F. App'x 705, 710 (10th Cir. 2010) (unpublished); *see also Maschner,* 899 F.2d at 949 (stating plaintiff must "prove that the actual motivating factor behind defendants' actions was retaliation for his prior or current litigation"); *Strope v. Cummings*, 381 F. App'x 878, 884 (10th Cir. 2010) (unpublished) ("Keeping in mind the rigorous burden placed on Strope to show not only that a retaliatory motive may have played some role in his transfer but that such a motive was the strict but-for cause of his transfer, we conclude that he has failed to make the necessary showing on this element to defeat [SJ], i.e., his evidence was 'merely colorable' at best and not 'significantly probative.'") (citations omitted). Therefore, it was critical to Plaintiff in avoiding SJ that he provide evidence detracting from Hughes's alternative justification for moving Plaintiff to other housing. *See McKune*, 382 F. App'x at 710.

For example, Hughes argues, based on his uncontroverted evidence, that the move out of Oquirrh 5 on August 7, 2014, was made because Plaintiff "was stirring up the other inmates and encouraging them to disobey policy and orders," (ECF No. 54-14, at 2); Plaintiff "has a habit of being out of place and out of bounds," (ECF No. 55-8, at 11), and "for management reasons," (*id*. at 3).

It is important to note that it was Defendant Green who allegedly threatened the move, while Hughes ordered the move. Hughes did not threaten the move, but instead allegedly vaguely "engaged in a series of hostile harassment" intended to get Plaintiff to drop his grievances. (ECF Nos. 28, at 22-23; 72-1, at 15.) Necessarily then, Plaintiff apparently asserts that the timing of his grievances within about a three-week period of Hughes's unspecified harassment and decision to move Plaintiff supports a link between his grievances and the move.

Still, his "attribution of retaliatory motive is . . . conclusory" at bottom. *Cummings*, 381 F. App'x at 883; *see also Banks*, 645 F. App'x at 774 n.2 ("A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient to create a genuine issue of fact concerning [a] First Amendment retaliation claim." (internal quotation marks and citation omitted) (alteration in original)); *Ellis*, 2017 U.S. Dist. LEXIS 108683, at *21 ("[I]nmate's mere speculation that actions taken by correctional officials were in retaliation for the exercise of his First Amendment rights cannot defeat summary judgment.") While Plaintiff very well did file grievances, that by itself does not provide the required nexus for his retaliation claim. *See id*. "If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness." *Id*. Of course, Plaintiff was not inoculated from standard confinement conditions simply because he was filing grievances. *See id*. The Tenth Circuit has "consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal nexus for a retaliation claim." *Id*. In sum, Plaintiff argues mere time correlation between grievances and Hughes's move of him.

Still, Hughes's explanations for his actions carry the day. Plaintiff has not shown that strictly "but for" a retaliatory motive Hughes would not have moved him to more restrictive housing with its consequent loss of privileges and property confiscation. *Banks*, 645 F. App'x at 772. He may even have suggested that retaliation for filing grievances played a role in moving Plaintiff to more restrictive housing (only if the Court takes the unwarranted step of linking Green's "threat" of moving to Hughes's decision to move) but he failed to show "that such retaliation was the decisive factor." *Strope*, 382 F. App'x at 710.

31

Hughes gave his reasons, supported by the evidence, for moving Plaintiff to other housing: Plaintiff "was stirring up the other inmates and encouraging them to disobey policy and orders," (ECF No. 54-14, at 2); Plaintiff "has a habit of being out of place and out of bounds," (ECF No. 55-8, at 11), and "for management reasons," (*id*. at 3).

Even if Plaintiff firmly believes that the timing of grievance submissions and housing moves were closely tied together and could arouse suspicion that the events were correlated, "temporal proximity per se is insufficient to show that the stated explanation for a challenged action is pretextual." *Id*.; *see also Smith v. Drawbridge*, No. CIV-16-1135-HE, 2017 U.S. Dist. LEXIS 175923, at *27 (W.D. Okla. Sept. 8, 2017) (R. & R.) (stating "'suspicious timing,' without more, is insufficient to support a reasonable inference that these actions" were taken because Plaintiff exercised constitutional rights), *adopted by* 2017 U.S. Dist. LEXIS 175014 (Oct. 23, 2017). Hughes has "come forward with reasons for" the action taken toward Plaintiff. *Northington v. Zavaras*, No. 99-1184, 2000 U.S. App. LEXIS 19113, at *10 (10th Cir. August 10, 2000) (unpublished).

Plaintiff's retaliation claim against Hughes fails due to his lack of evidence showing (a) there was an injury; (b) his constitutionally protected behavior was chilled; and (c) a but-for motive of retaliation regarding Plaintiff's exercise of his First Amendment rights. Plaintiff has not shown that Hughes violated his constitutional rights here and is thus entitled to qualified immunity.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that:

**(1)** All requests for declaratory and injunctive relief are **DISMISSED** as moot, Plaintiff having

been released from UDOC custody.

**(2)** Remaining Defendants' summary-judgment motion is **GRANTED**, based on qualified

immunity. (ECF No. 56.)

**(3)** With no controversy remaining in this Court, this action is **CLOSED.**

DATED this 28th day of May, 2020.

BY THE COURT:

_____
JUDGE DEE BENSON
United States District Court